IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WOLF RECOVERY FOUNDATION, and WESTERN WATERSHEDS PROJECT, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE, et al., <br><br> Defendants. | Civ. No. 09-0686-E-BLW <br><br> MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

The Court has before it a motion for injunctive relief filed by plaintiffs. The Court held oral argument on February 18, 2010, and the motion is at issue. For the reasons described below, the Court will deny the motion.

## LITIGATION BACKGROUND

Plaintiffs seek to enjoin the Forest Service from using helicopters in the Frank Church Wilderness to dart and collar wolves. Plaintiffs claim that the use of aircraft violates NEPA and the Wilderness Act.

In 1964, Congress passed the Wilderness Act to protect areas "untrammeled

by man, where man himself is a visitor who does not remain." *See* 16 U.S.C. § 1131(c). The landing of aircraft, among other activities, is banned "except as necessary to meet minimum requirements for the administration of the area." *See* 16 U.S.C. § 1133(c).

In 1980, Congress created the Frank Church Wilderness, spanning 2.4 million acres, the largest forested wilderness in the lower 48 states. The enabling legislation – the Central Idaho Wilderness Act – provided that this area would be governed by the Wilderness Act.

Just two years earlier, in 1978, the gray wolf was declared to be an endangered species under the Endangered Species Act (ESA). In an attempt to reintroduce the wolf to the Rocky Mountain area, the Fish and Wildlife Service released 35 gray wolves into the Frank Church Wilderness in 1995 and 1996.

As the reintroduction became successful, and wolf numbers grew, the Idaho Legislature approved a Wolf Conservation and Management Plan in 2002. It states that "[m]onitoring wolf populations is the cornerstone of a management program." Tasked with managing the wolf population, the Idaho Fish and Game Commission prepared a Wolf Population Management Plan for the years 2008 to 2012 with the goal of "ensur[ing] the long-term viability of the gray wolf population."

In 2009 the gray wolf was taken off the ESA endangered species list in

**Memorandum Decision & Order – page 2**

Idaho. Both the ESA and the Wolf Population Management Plan required Idaho to monitor wolves for 5 years after delisting.

To fulfill these duties, the Idaho Department of Fish and Game (IDFG) requested authorization from the Forest Service to use helicopters to dart and collar wolves in the Frank Church Wilderness. The Forest Service proposed to issue a special use permit to the IDFG for this purpose and took public comments. The Forest Service then issued a Decision Memorandum finding that the permit would issue and explaining its decision as follows:

> Because of the importance of wolf recovery to enhancement of wilderness character, the high public interest in the recovery of wolves and the desire for knowledge about wolves in central Idaho, it is important that IDFG obtain accurate wolf population data for central Idaho wilderness.

*See Decision Memorandum at AR 008606.*

In issuing the special use permit, the Forest Service did not prepare an Environmental Assessment or other NEPA analysis, but instead relied on two categorical exclusions. The first was established by the Secretary of Agriculture for "[i]nventories, research activities, and studies, such as resource inventories and routine data collection when such actions are clearly limited in context and intensity." *See* 7 C.F.R. § 1b.3(a)(3)). The second was from the Forest Service's own regulation providing a categorical exclusion for "[a]pproval, modification, or

continuation of minor special uses of [National Forest System] lands that require less than five contiguous acres of land." *See* 36 C.F.R. § 220.6(e)(3).

The flights under the special use permit will begin on February 22, 2010, and last for about a two-week period coinciding with the IDFG's annual big game survey. That survey is a pre-existing helicopter use in the Frank Church Wilderness that is not challenged here. To conduct the survey, the IDFG uses helicopters, flying at about 200 to 300 feet over the Wilderness area, to spot game animals. In contrast, the darting and collaring operation would involve flights at 20 to 30 feet above the ground once wolves are sighted and pursued. The Forest Service has authorized a maximum of 20 landings, which would occur on snow or frozen ground.

If wolves are spotted from the helicopter, the helicopter will land to remove its doors in preparation for the use of the dart gun. Then it would resume flying to relocate the wolves, and fly and hover at low elevations (20-30 feet) to pursue the target wolf until there was a clear shot to dart it. Generally half of all shots miss their mark so it might require several shots to hit the wolf with the dart. Once a wolf was hit, the helicopter would either land briefly to off-load personnel and equipment (to measure and collar the wolf) and then either fly to a near-by landing strip while the collaring was done, or land at the site of the wolf for

approximately a half hour while the wolf is collared if no landing strip is located near-by. Once the collaring is completed, the helicopter will pick up the personnel and equipment and leave the site.

The plaintiffs seek to enjoin this helicopter use on the ground that it violates (1) the Wilderness Act and (2) NEPA. Before turning to these issues, the Court will review the standard for granting an injunction.

## STANDARD OF REVIEW

Plaintiffs seeking a preliminary injunction must establish that they are likely to succeed on the merits, are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365 (2008). A "possibility" of irreparable harm is insufficient; irreparable injury must be "likely" in the absence of an injunction. *Id.* A preliminary injunction is "an extraordinary remedy never awarded as of right." *Id.* at p. 376. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at p. 376.

# ANALYSIS

**<u>Wilderness Act</u>**

The plaintiffs allege that this special use permit violates the Wilderness Act because it is not "necessary to meet minimum requirements for the administration of the area." *See* 16 U.S.C. § 1133(c). Courts have construed this phrase "narrowly." *See High Sierra Hikers Ass'n v. U.S. Forest Service*, 436 F.Supp.2d 1117 (E.D.Cal. 2006). Under this language, the court in *High Sierra* banned the construction of small dams that would restore fishing in a wilderness area. *Id*. The court reasoned that recreational fishing was "not an integral part of the wilderness nature of the area" and thus the building of small dams to enhance fishing was not "necessary" for administration of the area, *i.e*, necessary for maintaining the area as a wilderness. *Id*. at 1137.

Similarly, the "acquisition and use of a large passenger van for transporting tourists cannot reasonably be squeezed into the phrase 'necessary to meet minimum requirements of administration.'" *See Wilderness Watch v. Mainella,* 375 F.3d 1085, 1093 (11th Cir. 2004). To constitute "administration of the area," the activity must further the wilderness character of the area: "A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are

untrammeled by man." *See* 16 U.S.C. § 1131(c).

Helicopters carry "man and his works" and so are antithetical to a wilderness experience. It would be a rare case where machinery as intrusive as a helicopter could pass the test of being "necessary to meet minimum requirements for the administration of the area."

However, this case may present that most rare of circumstances. Here, the helicopters are used to collect data on wolves. The wolves were released in the Frank Church Wilderness to restore the area's wilderness character. Currently, there is a "lack of data . . . on denning sites, wolf movement patterns and distribution, rendezvous sites, numbers of packs and breeding pairs, an other behavior patterns . . . ." *AR 008566*. Of the 14 or so wolf packs in the Frank Church Wilderness, 8 to 10 have no wolves with radio collars. That data gap is specifically why the helicopters are being used. Their use will be limited to a two-week period, during which the IDFG is already flying to conduct its annual big game survey, and only 20 landings are authorized.

Plaintiffs argue, however, that the use of helicopters is not "necessary" because the Nez Perce caught and collared wolves using leg-hold traps. The Forest Service rejected this option because traps cannot target alpha males – the preferred type of wolf to collar – and are less humane and more prone to cause injuries.

**Memorandum Decision & Order – page 7**

Scattering leg-hold traps about the wilderness area, with their associated signage and trapper presence, would seem to denigrate the wilderness experience as much as a helicopter.

Plaintiffs also argue that the wolves have thrived without helicopter collar operations, and thus this activity is unnecessary. But the purpose of the IDFG's collaring is much more than just to count numbers; it is also designed to improve the understanding "of the character of the wilderness prior to man's intervention" and "the predator/prey relationship that existed in the past." *See AR 008579.* As discussed above, there is currently a lack of data on many aspects of the wolves' behavior in the Frank Church Wilderness.

The Court is faced with a very unique circumstance here. It was man who wiped out the wolf from this area. Now man is attempting to restore the wilderness character of the area by returning the wolf. As the numbers have grown, and delisting occurred, the goal is no longer simply restoration but now focuses on long-term viability and a balance among prey and predator. The collaring project and its use of helicopters is sufficiently limited and focused on restoring the wilderness character of the area that it falls within the phrase "necessary to meet minimum requirements for the administration of the area." *See* 16 U.S.C. § 1133(c).

**NEPA**

The Forest Service did not conduct an EA or EIS but instead found that the activity fell within the terms of two categorical exclusions. For the first categorical exclusion, the Forest Service relied upon a category established by the Secretary of Agriculture for "[i]nventories, research activities, and studies, such as resource inventories and routine data collection when such actions are clearly limited in context and intensity." *See* 7 C.F.R. § 1b.3(a)(3). For the second, the Forest Service also found that the research project fit its own CE for "[a]pproval, modification, or continuation of minor special uses of [National Forest System] lands that require less than five contiguous acres of land." *See* 36 C.F.R. § 220.6(e)(3).

The collaring operation would appear to be a "research activity" or "study" under the first categorical exclusion. Plaintiffs argue that it is by no means "routine," but that word is used in the regulation merely as an example rather than as a limitation.

Plaintiffs correctly point out, however, that the 'research activity" or "study" must be "limited in context and intensity." The word "context" requires an examination of the significance of the project "in several contexts such as . . . the affected region, the affected interests, and the locality." *See* 40 C.F.R. § 1508.27.

**Memorandum Decision & Order – page 9**

The word "intensity" refers to the "severity of the impact" and requires consideration of, among other things, (1) the unique characteristics of the area, (2) "the degree to which the action may establish a precedent for future actions," (3) the cumulative impacts, and (4) the "degree to which the effects on the quality of the human environment are likely to be highly controversial." *Id.*

Clearly the use of helicopters in a wilderness area is highly intrusive and controversial, and must be deemed "intense" as that term is defined above. And yet, at the same time, it appears to be properly "limited" so that it falls within the terms of the categorical exclusion. The fly-overs are restricted to 20 landings over a two-week period during which fly-overs for the annual big game survey will occur. This would be a much different case if the collaring operation was being done at a different time than the big game survey fly-overs.

The "context" requires consideration of the "affected interests." Here the Court is heavily persuaded by the unique circumstances of this case. The use of helicopters is designed to restore a specific aspect of the wilderness character of the Frank Church Wilderness that had been earlier destroyed by man. In that context, the helicopter flights for this particular operation are consistent with the categorical exclusion that requires they be "limited in context and intensity."

**Memorandum Decision & Order – page 10**

**The Court's Concern**

The plaintiffs described their version of the Forest Service's argument: "We must destroy the wilderness in order to save it." Plaintiffs make a telling point here. The Frank Church Wilderness must "retain its primeval character and influence" and provide "outstanding opportunities for solitude." *See* 16 U.S.C. § 1131(c). A helicopter ruins these opportunities. At the same time, the helicopter can be necessary to restoring the wilderness character of the area.

This is a conundrum, and its answer depends on the vision of the Wilderness Act. That Act could have directed that the area remain entirely wild and unmanaged, but it did not take that path. Instead, the Act contemplates some management "necessary to meet minimum requirements for the administration of the area." The Court finds above that the proposed activity meets this definition.

Still, the Court shares plaintiffs' concerns that this decision could be interpreted wrongly as a stamp of approval on helicopter use. It is not for two reasons.

First, the decision is limited by its facts: This proposed activity is designed to aid the restoration of a specific aspect of the wilderness character of the Frank Church Wilderness that had earlier been destroyed by man. The use of helicopters for any other purpose would be extremely difficult to justify under the Wilderness

Act, NEPA, or any categorical exclusion.

Second, the next helicopter proposal in the Frank Church Wilderness will face a daunting review because it will add to the disruption and intrusion of this collaring project. The Forest Service must proceed very cautiously here because the law is not on their side if they intend to proceed with further helicopter projects in the Frank Church Wilderness. The Court is free to examine the cumulative impacts of the projects, and the context of the use. Given that this project is allowed to proceed, the next project will be extraordinarily difficult to justify.

It is in the context of these limitations that the Court finds plaintiffs are not likely to prevail on their claims under the Wilderness Act and NEPA. Accordingly, the Court will deny the motion for injunctive relief.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for TRO and/or preliminary injunction (docket no. 8) is DENIED.

DATED: **February 19, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order – page 12**