LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO

Clive J. Strong
Chief, Natural Resources Division
Kathleen E. Trever (ISB# 4862)
Kathleen.Trever@idfg.idaho.gov
Deputy Attorneys General
600 S. Walnut Street
P.O. Box 25
Boise, ID 83707
Telephone: (208) 334-3771
Fax: (208) 334-4885

*Attorneys for Idaho Department of Fish and Game*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| WOLF RECOVERY FOUNDATION, and WESTERN WATERSHEDS PROJECT, | ) ) ) No. 09-CV-00686-BLW ) |
| Plaintiffs, | ) ) **DEFENDANT-INTERVENOR IDAHO** ) **DEPARTMENT OF FISH AND GAME'S** |
| v. | ) **MEMORANDUM IN SUPPORT OF** ) **MOTION FOR SUMMARY** |
| U.S. FOREST SERVICE and USDA APHIS WILDLIFE SERVICES, | ) **JUDGMENT ON PLAINTIFFS'** ) **SECOND CLAIM FOR RELIEF** ) |
| Defendants. | ) ) |

## I.   INTRODUCTION

Defendant-Intervenor Idaho Department of Fish and Game (IDFG) submits this

Memorandum in Support of its Motion for Summary Judgment and in Opposition to Plaintiffs'

IDFG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON
PLAINTIFFS' SECOND CLAIM FOR RELIEF - 1

Motion for Summary Judgment on Second Claim for Relief (Docket No. 69). To avoid unnecessary duplication, Idaho has reviewed, and herein adopts by reference, the standards of review and argument of the Federal Defendants in their Memorandum in Support of Motion for Summary Judgment (Docket No. 71-1) and their Response to Plaintiffs' Statement of Undisputed Fact (Docket No. 72).[1]

## II. ARGUMENT

**A. Plaintiffs' alleged injury under their Second Claim is not redressable by this Court.**

With the re-listing of wolves, the state of Idaho resumed lead management authority[2] for wolf management acting as USFWS' "designated agent." Under USFWS' 10j rules "designated agents" include "Federal agencies authorized or directed by the Service" and States or Tribes with wolf management plans approved by the Service. 50 CFR §17.84(n)(3).

USFWS conducted NEPA analysis regarding alternatives for control of nonessential, experimental wolf populations in Idaho, both in conjunction with its 1994 decision regarding the release of wolves into central Idaho and in subsequent rulemakings. USFWS 10j rules promulgated in 1994, 2005, and 2008 for the management of 10j wolf populations in Idaho included specific allowances for lethal wolf control by USFWS or its designated agents in

---

[1] IDFG would add that in the *Defenders* case, Judge Molloy found that USFWS had violated the ESA by delisting only a portion of the area USFWS had defined as a distinct population segment. He specifically did not rule, however, on population size, genetic interchange or the adequacy of state regulatory mechanisms in Idaho and Montana. *Defenders of Wildlife v. Salazar,* 2010 WL 3084194 at *18. Although federal defendants in that case have not filed a notice of appeal as noted in APHIS' brief and statement of facts, the State of Idaho filed a notice of appeal with the Ninth Circuit Court of Appeals in the case earlier today (September 30, 2010).

IDFG also notes a typographical error in footnote 16 of Federal Defendants' Memorandum: most of APHIS' current categorical exclusions appear to be in effect through December 2010.

[2] Prior to the May 2009 delisting, the State of Idaho assumed lead management authority for wolves in Idaho pursuant to a 2006 Memorandum of Agreement with the U.S. Secretary of the Interior (AR 1531-1533). In conjunction with the vacatur of the delisting rule and reinstatement of the framework to manage the gray wolf in Idaho as a listed species, the State of Idaho is in the process of renewing its Memorandum of Agreement with the Department of the Interior consistent with 50 CFR §17.84(n)(11). The State also receives federal funding for wolf management through a cooperative agreement with USFWS.

response to livestock depredations. The parameters of APHIS' wolf control actions to respond to livestock depredations are thus set by USFWS' 10j rule [50 CFR §17.84(n)(4)(viii)].[3] Notably, however, it is not USFWS' authorizations of 10j control actions by its designated agents that are before this Court.

In Idaho, APHIS' wolf control actions to respond to livestock depredations will only occur at the request of IDFG as USFWS' designated agent.[4] As APHIS points out, (APHIS Memo. at 14-15), IDFG may choose to conduct its own control actions to respond to livestock depredations, just as IDFG used outfitters as IDFG volunteers to conduct control actions in spring 2010 to address impacts to elk in the Lolo Zone while wolves were delisted (*see* AR 2500, indicating IDFG's intent to use state personnel if APHIS were unable to assist in control actions to address ungulate impacts).

Although most directly analogous to control actions authorized under state statutory authorities rather than as USFWS' designated agent, the reasoning in another case involving a challenge to APHIS' NEPA compliance still applies here. *Goat Ranchers of Oregon v. Williams*, 2009 WL 883581 (D.Or., 2009), *affirmed*, 2010 WL 2000687 (9th Cir., 2010; noted as non-precedential in accordance with Ninth Circuit Rule 36-3). The District Court in *Goat Ranchers* found that challenges to APHIS' reliance on an environmental assessment with limited alternatives was not redressable in federal court given Oregon's independent authorities and actions regarding cougar control. *Id.* at *10-14. Likewise, IDFG could continue the conduct

---

[3] In conjunction with his August 5, 2010 decision, Judge Molloy lifted a stay on litigation filed in 2008 by several organizations challenging USFWS'2008 modifications to its 2005 10j rule for management of nonessential experimental wolf populations in states with approved wolf management plans. *Defenders of Wildlife v. Gould,* No. CV-08-14-M-DWM. Plaintiffs in that case, however, did not challenge the 2005 10j rule, but only the 2008 amendments to it, most particularly as they relate to control actions to address ungulate impacts. Any challenge to the 1994 10j rule or underlying NEPA analysis is barred by the statute of limitations. *Turtle Island Restoration Network v. U.S. Dep't of Commerce,* 437 F.3d 937, 942-43 (9th Cir. 2006).

[4] In Wyoming, where USFWS has not approved a state management plan, USFWS would be the entity to authorize APHIS wolf control actions in response to livestock depredations. *See* 50 CFR §17.84(i).

IDFG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND CLAIM FOR RELIEF - 3

Plaintiffs challenge in this case under its authorities as a USFWS designated agent under the 10j rule (or under its own independent wildlife management authorities when wolves are again delisted). Any challenge to IDFG's actions under 10j would involve USFWS' authorities and authorizations, which are again not at issue in this case and whose record is not before this Court.

Plaintiffs' Memorandum also attempts to use the potential for certain state actions under 10j or other provisions of the Endangered Species Act as grounds for requiring APHIS to perform additional NEPA analyses (Plaintiffs' Memo. at 21). The propriety of state wolf population objectives as applied to the listed population,[5] proposals for additional wolf control for the benefit of ungulates in the Lolo Zone, and proposals for hunting would be the subject of USFWS actions or authorizations (*e.g.,* under 50 CFR §17.84(n)(4)(v)). Such authorizations by USFWS are speculative and not the subject of this case in any event.

### B. Plaintiffs have not demonstrated they are entitled to injunctive relief.

Even if the Court were to consider Plaintiffs' Second Claim and determine it to have substantive merit, Plaintiffs have failed to demonstrate that they are entitled to injunctive relief. In NEPA cases it "is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test…." *Monsanto v. Geertson Seed Farms,* __ U.S. ___, 130 S.Ct. 2743, 2756-2757 (2010) (quoting and rejecting a petitioner's citation to *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 833 as Ninth Circuit precedent for the proposition that in " 'the run of mill NEPA case,' " an injunction delaying the contemplated government project is proper " 'until the NEPA violation is cured," finding that "[i]nsofar as the statements quoted above are intended to guide the determination whether to grant injunctive

---

[5] USFWS approved the management objectives established in IDFG's 2008-2010 Idaho Wolf Management Plan for the five years following delisting in conjunction with USFWS'prior delisting rules.

IDFG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND CLAIM FOR RELIEF - 4

relief, they invert the proper mode of analysis). "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Id.* at 2761 (citation omitted).

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 2756-7 (quotations omitted). "The traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation." *Id.*, citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. ___, 129 S.Ct. 365, 380-382, (2008).

APHIS has pointed out to the Court Plaintiffs' lack of injury for purposes of standing, much less to support injunctive relief (APHIS' Memo. at 10-14, 29). Assuming for the purposes of argument only that Plaintiffs have suffered an irreparable injury, the balance of harms clearly weighs in IDFG's favor. The injury alleged by the Plaintiffs' are vaguely stated. At most, Plaintiff's injury, as alleged by Mr. Cole, would involve a small geographic area and an incremental impact on his interests in a wolf population in Idaho estimated at the end of 2009 to be at the very least 850 wolves in 94 packs statewide.

By contrast, Idaho's fundamental sovereign interests in managing its wildlife, as effected by IDFG, are clearly harmed when APHIS is prevented from assisting IDFG in implementing its statutory authorities for control of wildlife. *See Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 204 (1999) ("State have important interest in regulating wildlife and natural resources within their borders; s*ee also* Idaho Code §36-103(a)(wildlife policy of the

IDFG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON
PLAINTIFFS' SECOND CLAIM FOR RELIEF - 5

state of Idaho) and Idaho Code §36-715(2) (referencing IDFG's participation during the transition from federal management to state management in activities regarding nuisance wolves in cooperation with APHIS and other federal, state, local or tribal entities regarding damage complaints, depredation, effects on ungulate populations and other conflicts regarding wolves in the state).

IDFG's ability to implement control actions in response to wolf depredations on livestock and other domestic animals determined appropriate under 10j rules would be significantly impaired if it could not call upon the experience and resources of APHIS to conduct IDFG-authorized actions. Such impairment would likely result in significant increases in expenditure of IDFG time, personnel and fiscal resources to compensate.[6]

IDFG recognizes that public interest considerations traditionally weigh in favor of the recovery of endangered species in determining injunctive relief. *See, e.g., TVA v. Hill,* 437 U.S. 153 (1973). In the case before the Court, however, USFWS, and likewise IDFG, do not equate the potential deaths of individual wolves or packs implicated in human conflict or livestock depredations as contrary to species recovery or inherent "irreparable harm."[7] Indeed, the record is clear that the federal government has determined that the ability to respond to wolf depredation on livestock and other domestic animals is key to wolf conservation, both from a biological and social standpoint. A fundamental purpose of Section 10j of the Endangered

---

[6] As did APHIS (APHIS Memo. at 28), IDFG would respectfully request, should this Court find Plaintiffs' Claim to have merit, that it conduct separate proceedings to determine what, if any, injunctive relief is warranted based on a balancing of harms and the public interest.

[7] In evaluating a request for preliminary injunction, Judge Molloy rejected plaintiffs' arguments that proposed 2009 hunting seasons in Idaho and Montana were likely to cause irreparable harm through the death of individual wolves, through harm to the overall population and through the inability of Plaintiff members to see wolves in the wild. Judge Molloy found that the taking of individual wolves did not inherently cause irreparable harm for purposes of the endangered species act and other environmental laws. He also concluded that all proof submitted by expert affidavit was that the proposed killing of individual wolves in Idaho and Montana would not pose an irreparable injury to the wolf populations in question or their genetic connectivity. *Defenders of Wildlife v. Salazar,* CV.09-77-M-DWM, Order at 9-12 (September 8, 2009).

IDFG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND CLAIM FOR RELIEF - 6

Species Act and rules promulgated thereunder is to balance the interrelated but often competing concerns of species conservation and interests in human safety, species' impacts on land management and private property rights, and effects on other species.

Addressing these concerns has been a fundamental component of USFWS decision-making and a core principle of USFWS's decision to release wolves into Central Idaho and designate a nonessential, experimental wolf population.  Even APHIS' partial record on this subject demonstrates the intertwined nature of USFWS' analysis and decision to release wolves into Central Idaho as a nonessential, experimental population with USFWS' analyses and decisions to allow control in response to depredation on livestock and other domestic animals. The first of the 9 major issues and impacts and concerns used to describe the alternatives in USFWS' 1994 Final Environmental Impact Statement (FEIS) for reintroduction of wolves was "How will depredations on domestic animals be controlled?" (AR 50).

Wolf recovery advocates, such as Plaintiffs, did not mount any legal challenge to USFWS' decision to release wolves into central Idaho despite USFWS'1994 decision and 10j rule allowance for lethal control of wolves in response to livestock depredations.  [8]USFWS' 1994 analyses and subsequent rulemaking encompassed a range of control strategies and methods. *E.g.,* AR 14, 20, 47-48, 65-66, 295, 2108-26; *see also* 70 Fed. Reg. 1292-1293 (2005) (review of issues identified in draft 2005 10j rule, discussing nonlethal and lethal control methods and rule's allowance for removal of problem wolves, through such methods as darting, net-gunning or gunning from aircraft).

---

[8] Similarly, none of the more than 160,000 comments received on the USFWS 1993 draft EIS on wolf reintroduction, including comments by Plaintiff Wolf Recovery Foundation, appear to have identified the EIS' failure to specifically reference the Sawtooth National Recreation Area or its Organic Act as significant from a NEPA standpoint (*see* AR 267-323).  Notably, however, USFWS' 1994 EIS described and evaluated wildlife, recreation, land use, livestock and other issues for all of the national forests containing lands comprising the SNRA (*see, e.g.,* AR 155, 164-65, 167-68.

IDFG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND CLAIM FOR RELIEF - 7

In embarking on its experiment to release wolves into central Idaho, USFWS made—and has sustained--a determination that the control of wolves involved in depredations on livestock and domestic animals is fundamental to species recovery.  USFWS made this determination when wolves were far fewer in numbers and far less distributed.  It would apply even more so now with the current, burgeoning wolf population involved in significantly higher levels of depredation.  The balance of harms and the public interest considerations clearly do not support the broad injunctive relief Plaintiffs request.

## CONCLUSION

For the foregoing reasons, Defendant-Intervenor IDFG requests that the Court grant its motion for summary judgment and deny Plaintiffs' motion for summary judgment on the Second Claim for Relief and deny all relief sought by Plaintiffs.

Respectfully submitted this 30th day of September, 2010.

>
> LAWRENCE G. WASDEN
> ATTORNEY GENERAL
> STATE OF IDAHO
>
> /s/ Kathleen E. Trever
> Kathleen E. Trever
> Deputy Attorney General
> Idaho Department of Fish and Game

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of September 2010, I filed the foregoing DEFENDANT-INTERVENOR IDFG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND CLAIM FOR RELIEF electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Laurence J. Lucas, Attorney for Plaintiffs
llucas@lairdlucas.org

Lauren M. Rule, Attorney for Plaintiffs
lrule@advocateswest.org

Deborah Ferguson, Attorney for Defendants
Assistant U.S. Attorney, District of Idaho
Deborah.Ferguson@usdoj.gov

Beverly Li, Attorney for Defendants
U.S. Department of Justice
Beverly.Li@usdoj.gov

Kathryn M. Liberatore, Attorney for Defendants
U.S. Department of Justice
Kathryn.Liberatore@usdoj.gov

  /s/ Kathleen Trever
Kathleen Trever
Deputy Attorney General
Idaho Department of Fish and Game