Lauren M. Rule (ISB # 6863)
ADVOCATES FOR THE WEST
PO Box 1612
Boise ID 83701
(208) 342-7024
(208) 342-8286 (fax)
lrule@advocateswest.org

Laurence ("Laird") J. Lucas (ISB # 4733)
PO Box 1342
Boise ID 83701
208-424-1466 (phone and fax)
llucas@lairdlucas.org

Attorneys for Plaintiffs


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO


| | | |
|---|---|---|
| WOLF RECOVERY FOUNDATION, and WESTERN WATERSHEDS PROJECT | ) ) ) | No. 09-cv-686-BLW |
| Plaintiffs, | ) ) ) ) | **PLAINTIFFS' RESPONSE/ REPLY IN OPPOSITION TO DEFENDANTS' CROSS MOTION AND IN SUPPORT** |
| U.S FOREST SERVICE and USDA APHIS WILDLIFE SERVICES, | ) ) ) | **OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) ) | |

## <u>INTRODUCTION</u>

As the federal government has done in many contexts over the past few years, Wildlife Services is trying to avoid its duty under NEPA to study and assess the effects of its statewide wolf control activities by relying on categorical exclusions ("CEs").  These CEs are unlawful, however, because the widespread wolf control activities at issue here do not fit within the narrow category of "routine measures" upon which Wildlife Service relies, and they unlawfully segment the activities by wolf management zone and ignore cumulative effects.  Wildlife Services also attempts to rely on its 5-year monitoring reviews to satisfy NEPA for its wolf control activities, but those reviews fail to consider a range of alternative actions and ignore many of the direct, indirect, and cumulative effects of Wildlife Service's actions, and thus also are not adequate under NEPA.  Rather than conduct minimal reviews in a piecemeal fashion, Wildlife Services must prepare a comprehensive NEPA analysis to take a hard look at its wolf control activities across the State.

Wildlife Services also contends that it does not need to comply with the SNRA Act, and can rely on the Forest Service's substantial impairment analysis to the extent it does need to conform with the substantial impairment standard from the Act.  Wildlife Services is incorrect that it need not comply with the SNRA Act.  The agency must implement its predator damage management in compliance with Acts that govern specially designated land like wilderness or the SNRA.  Furthermore, the Forest Service's analysis considered only whether livestock grazing on Forest Service land substantially impairs wolves.  Thus, its analysis focused on wolf control actions taken in response to conflicts on public land, not private land, and on the mitigation measures it was using on public land to reduce those conflicts. Wildlife Services has an independent duty to insure that all of its wolf control activities in and around the SNRA, on both

private and public land, do not substantially impair wolves there.

Finally, Wildlife Services tries to argue that the Court lacks jurisdiction over Plaintiffs'
claim, but Plaintiffs have clearly demonstrated standing for this claim, and the other
jurisdictional arguments also lack merit. Because Wildlife Services has violated NEPA and the
SNRA Act by failing to conduct the proper analyses under both statutes for its wolf control
activities, the Court should grant summary judgment in favor of Plaintiffs.

<u>**ARGUMENT**</u>

**I.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIM TWO.**

Defendant Wildlife Services spends a full third of its analysis arguing that the Court does
not have jurisdiction over Plaintiffs' Second Claim For Relief.  *See Def. Brief at 9-17* (Dckt. No.
71-1).  As demonstrated below, however, these arguments fail because Plaintiffs have
demonstrated standing through the declarations they filed in this litigation, and Defendants'
statute of limitations and mootness arguments are not relevant here.

**A.    Plaintiffs Have Demonstrated Standing.**

Wildlife Services contends that Plaintiffs have not demonstrated an injury in fact or that
their injury is redressable, and thus have not established standing to sue under claim two.  *Def.
Br. at 10-15*.  These assertions are false because Plaintiffs have shown that they regularly use and
enjoy many areas in which Wildlife Services conducts wolf control actions, that they are injured
by Wildlife Service's lack of NEPA and substantial impairment analysis for those actions, and
that judicial relief would redress their injury.

1.    <u>Injury in fact</u>

To establish an injury in fact for procedural injuries, a plaintiff must show "that the
procedures in question are designed to protect some threatened concrete interest of his that is the

ultimate basis of his standing." *Citizens for Better Forestry v. U.S. Dep't of Agric.,* 341 F.3d 961, 969 (9th Cir. 2003). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.'" *Cantrell v. City of Long Beach,* 241 F.3d 674, 680 (9th Cir. 2001) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 183 (2000)). As the Ninth Circuit recently stated, an environmental plaintiff can establish injury in fact by showing "a connection to the area of concern sufficient to make credible the connection that the person's life will be less enjoyable—that he or she really has or will suffer in her or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Western Watersheds Project v. Kraayenbrink,* --F.3d--, 2010 WL 3420012 at *8 (9th Cir. Sept. 1, 2010) (quoting *Ecological Rights Found. v. Pac. Lumber Co.,* 230 F.3d 1141, 1149 (9th Cir. 2000)); *see also The Wilderness Soc'y v. Rey,* --F.3d--, 2010 WL 3665713 at *4 (9th Cir. Sept. 22, 2010) (to show recreational or aesthetic injury, it is sufficient to show that the plaintiff "had repeatedly visited an area affected by a project, that he had concrete plans to do so again, and that his recreational or aesthetic interest would be harmed if the project went forward without his having the opportunity to appeal.").

In *Kraayenbrink,* a case challenging the Bureau of Land Management's new nationwide grazing regulations, the Court held that Plaintiff Western Watersheds Project had demonstrated injury in fact for its NEPA claims where declarations of WWP staff explained that WWP is actively engaged in how BLM manages public lands and identified numerous affected areas that staff members have personally visited and continue to visit. 2010 WL 3420012 at *9. For instance, the declaration of Jon Marvel identified numerous grazing allotments "that he has personally visited and continues to visit, study, enjoy, and in which he pursues recreational

activities."  Likewise, Kathleen Fite's declaration identified specific affected locations and allotments that "she visits, studies, works to protect, and over which the [challenged regulations] will exclude her from participating in various management decisions." *Id.*   The Court held these declarations established that the challenged regulations "pose an imminent harm to Western Watersheds Project's members' aesthetic enjoyment of the rangeland and to their involvement in public land grazing management . . . . The Kite [sic] and Marvel declarations establish a geographic nexus between Western Watersheds Project's members and the locations subject to the 2006 Regulations, and, therefore, Western Watersheds Project has established a concrete interest sufficient to pursue their NEPA claim." *Id.*

Plaintiff Western Watersheds Project ("WWP") has similarly demonstrated standing for its claims here.[1]  WWP has provided two declarations from Kenneth Cole, a member and employee of WWP, establishing that he routinely looks for and studies wolves and wolf signs when he recreates and works and that he is actively engaged in wolf management issues.  *See Declaration of Kenneth Cole* (Dckt. No. 9); *Second Declaration of Kenneth Cole* (Dckt. No. 69). The first Cole declaration described his love of wolves and participation in activities related to wolves and wolf management, such as writing commentary on wolves and wolf management, regularly searching for signs of wolves and viewing and photographing wolves in their natural environment, helping test non-lethal wolf control methods as well as trap wolves, and being very disturbed when he witnessed Wildlife Services killing the Whitehawk wolf pack near the SNRA. *Cole Decl. ¶¶ 9, 10, 15-28, 40.*  He noted in particular viewing and tracking wolves in the Squaw Creek drainage near Clayton, Idaho.  *Id. ¶¶ 24-25.*

---

[1] Plaintiffs need only establish standing for one of the plaintiffs on the case because standing for one is standing for all.  *Clinton v. City of New York,* 524 U.S. 417, 431 n.19 (1998); *Board of Natural Resources v. Brown,* 992 F.2d 937, 942 (9th Cir. 1992).

The second Cole declaration reaffirmed Mr. Cole's love and interest in wolves and wolf management. He stated that he enjoys seeing and photographing wolves in their natural environment, particularly in Idaho, and has frequently observed wolves in the wild. *Second Cole Decl. ¶¶ 4-5.* He again noted his disturbance at seeing Wildlife Services gun down the Whitehawk pack and his disappointment that his chances of viewing a wolf had been diminished. *Id.* In addition to the wolf management activities discussed in the first declaration, the second declaration also noted that Mr. Cole seeks and reviews public information on wolves, such as the Idaho Wolf Conservation and Management Plan and Idaho Wolf Recovery Progress Reports, and has written many commentary stories on wolf management and wolf control activities in Idaho. *Id. ¶¶ 8-11.*

The second Cole declaration also discussed his regular visits to the SNRA, where he "observe[s] wolves, look[s] for signs of wolves like footprints and scat, and enjoy[s] seeing the ecosystem and knowing that wolves are there." *Id. ¶ 13.* He has seen wolves in and near the SNRA on numerous occasions, including in July 2010 when he saw two wolf pups just north of the SNRA in the Squaw Creek drainage, an area where Wildlife Services conducted control actions on the Buffalo Ridge pack in 2005, 2006, and 2008. *Id. ¶¶ 6, 15, 23-26.* He also noted two recent visits to the Sawtooth Valley in the SNRA since the killing of the Basin Butte pack there in November 2009, when he searched in vain for wolf signs in areas where he had seen numerous signs in the past. *Id. ¶ 32.* As Mr. Cole noted, Wildlife Services conducts many of its wolf control activities in central Idaho, particularly in and around the SNRA. *Id. ¶¶ 20-31 & Ex. D; see also AR APHIS 002364 n.6, 2375-76* (control actions around SNRA); *Third Declaration of Lauren Rule Ex. A* (articles discussing Wildlife Service's killing of two wolves in SNRA in September 2010) (attached hereto).

PLAINTIFFS' RESPONSE/REPLY BRIEF ON SECOND CLAIM FOR RELIEF - 5

Finally, Mr. Cole stated:

> I plan to continue to visit natural areas throughout Idaho, including the SNRA, in the near future.  My enjoyment of these areas increases by trying to observe wolves and signs of wolves, and just knowing that the ecosystem is in its natural state because wolves are present.  Activities by Wildlife Services and IDFG that kill wolves, remove wolf packs, and reduce the wolf population in Idaho injure my interests in observing, studying, and looking for wolves and my enjoyment of being in an ecosystem that I know is in its natural state because wolves are there.

*Id. ¶ 34.*  Observing and looking for wolves and enjoying visiting an ecosystem in its natural state are aesthetic and recreational interests that, if interfered with, can constitute injury for standing purposes.  *See Cantrell,* 241 F.3d at 682 (recognizing injury from activity that interfered with plaintiffs' ability to enjoy viewing shore birds in their natural habitat); *Fund for Animals v. Lujan,* 962 F.2d 1391, 1396 (9th Cir. 1992) (injury from diminished opportunity to view bison in Yellowstone and from emotional distress caused by watching bison be killed); *Sierra Club v. U.S. Fish and Wildlife Service,* 235 F. Supp.2d 1109, 1125-26 (D. Or. 2002) (predator-prey study that removed cougars from area could cause injury by detracting from wilderness experience and impairing enjoyment of hunting in the presence of all wildlife species).

The Cole declarations are sufficient to show standing for both the NEPA and SNRA Act claims, in line with the holding in *Kraayenbrink*.  They establish Mr. Cole's interest in wolves; that he regularly visits, and will continue to visit, areas in central Idaho, particularly in and around the SNRA; that his enjoyment of these areas increases by observing wolves, searching for wolf signs, and knowing that the ecosystem is in a natural state because wolves are there; and that he is injured when Wildlife Services conducts control actions that remove wolves and wolf packs and disturb the natural ecosystem.  Just like in *Kraayenbrink*, the fact that Mr. Cole repeatedly visits areas in central Idaho to search for and observe wolves, including at least three specific visits around the SNRA in just in the last year, and states that he will continue to visit

these areas in the near future, supplies the geographic nexus required to show an injury in fact.

This declaration is not like those found in *Summers v. Earth Island Institute* and *The Wilderness Society v. Rey*, where the plaintiffs had alleged a general desire to return to multiple National Forests in different regions of the country at some time in the future but did not allege that they had plans to visit the particular project area at issue in the litigation.  *Summers,* 129 S.Ct. 1142, 1150-51 (2009); *The Wilderness Soc'y*, 2010 WL 3665713 at *4-5.   Mr. Cole did not make vague allegations that he plans to return to some distance forest sometime in the future but, rather, that he plans to continue his regular visits to near-by central Idaho in areas where Wildlife Services routinely conducts wolf control activities.  Such allegations are sufficient to show injury in fact, as seen in *Kraayenbrink.*

Finally, the fact that the wolf population has expanded does not negate Mr. Cole's injury in fact.  It is uncontested that Wildlife Services conducts many control actions in central Idaho, especially in and around the SNRA, that often fully or partially remove entire packs.  *See Second Cole Decl. ¶¶ 20-31 and Ex. D; compare AR APHIS 001430-1506* (2005-2009 reports listing wolf packs that were subject to control actions) *to APHIS 001507-1511* (maps of wolf packs in Idaho 2005-2009); *AR APHIS 002364 n.6, 2375-76* (control actions around SNRA).  Indeed, Wildlife Services killed two more wolves in the SNRA just last month.  *See Third Rule Decl. Ex. A* (articles discussing Wildlife Service's killing of two wolves near Stanley, Idaho).  These consistent removals not only make it less likely that Mr. Cole would see wolves or signs of wolves in the areas that he regularly visits, it also means that these ecosystems are not in their natural state due to the unnatural removal of wolves, all of which injures Mr. Cole.  *Second Cole Decl. ¶ 34.*  Indeed, Mr. Cole specifically stated that he was unable to find signs of wolves in areas where he had seen numerous signs in the past after the Basin Butte pack was killed and was

PLAINTIFFS' RESPONSE/REPLY BRIEF ON SECOND CLAIM FOR RELIEF - 7

disheartened that the SNRA has become a sinkhole for wolves.  *Id. ¶ 32.*  Such testimony

certainly shows injury to Mr. Cole from Wildlife Service's control actions.[2]

        2.    <u>Redressability</u>

      "Once a plaintiff has established an injury in fact under NEPA the causation and

redressability requirements are relaxed."  *Kraayenbrink*, 2010 WL 3420012 at *9 (citing

*Cantrell*, 241 F.3d at 682).  "[T]he members must show only that they have a procedural right

that, if exercised, *could* protect their concrete interests . . . .Because it is enough that a revised

EIS may redress plaintiffs' alleged injuries, Western Watersheds Project satisfies the causation

and redressability requirements."  *Id.*  (internal quotation omitted).

      Wildlife Services and the State both argue that Plaintiffs' claims here are not redressable

because even if Wildlife Services does not carry out control actions, Idaho Department of Fish

and Game ("IDFG") could carry out those actions on its own as the designated agent for wolf

management in Idaho.  Thus, any relief against Wildlife Services would not redress Plaintiffs'

injury.  *See Def. Br. at 14-15, State Br. at 2-4* (Dckt. No. 74).  However, IDFG is no longer the

designated agent of U.S. Fish and Wildlife Service for wolf management and thus would not

carry out any control actions on its own.

      Governor Otter recently informed Secretary of Interior Salazar that "the State will not

manage wolves as the designated agent of the federal government.  That means the Idaho

Department of Fish and Game (IDFG) will not . . . implement the livestock depredation response

program."  *See Third Rule Decl. Ex. B* (Oct. 18, 2010 letter from Gov. Otter to Sec. Salazar).

---

[2] Wildlife Services also contends that because Mr. Cole has only established connections to certain wolf management zones, he has no standing for the remainder of the wolf management zones.  *See Def. Br. at 12 n.9.*  But this is beside the point.  If Mr. Cole has standing to assert that Wildlife Service must conduct NEPA analysis for its wolf control activities, then that requirement would apply to all wolf control activities regardless of where they occur.

Instead, U.S. Fish and Wildlife Service will resume lead management authority over wolves in Idaho and will authorize Wildlife Services to carry out the livestock depredation program and wolf control actions. *Third Rule Decl. Ex. C* (news release from U.S. Fish and Wildlife Service stating that, because Idaho terminated its management of wolves, U.S. Fish and Wildlife Service would work with Wildlife Services to investigate depredations and take wolf control actions). Thus, because the State would not conduct any control actions if relief were granted against Wildlife Services, Plaintiffs' claims are redressable.

> **B.    Defendants' Other Jurisdictional Arguments Are Irrelevant.**

Wildlife Service's other jurisdictional arguments have no bearing on Plaintiffs' claims. The statute of limitations argument does not apply because Plaintiffs are not challenging the substance of the 1994 wolf reintroduction EIS or the 1996 and 2002 Predator Damage Management Program EAs. *See Def. Br. at 16.* They are challenging Wildlife Service's current wolf control activities because those activities have not undergone proper NEPA analysis. None of the prior NEPA documents analyzed wolf control actions and thus those ongoing actions are being conducted in violation of NEPA.

Second, regardless of whether the 2008 and 2009 CEs have expired, the 2010 CEs are still in effect and thus there is a live controversy challenging the use of CEs here to escape proper NEPA analysis. Furthermore, if the 2010 CEs should expire before resolution of Plaintiffs' claims, they certainly fall within the "capable of repetition yet evading review" exception to mootness. The Ninth Circuit has repeatedly ruled that one-year decisions fall within this exception. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329-30 (9th Cir. 1992) (one year permit); *Natural Resources Defense Council, Inc. v. Evans*, 316 F.3d 904, 910 (9th Cir. 2003) (one year rule for fishing management); *Alaska Center for Environment v. U.S. Forest Service,*

189 F.3d 851, 855 (9th Cir. 1999) (two year permit).  And the fact that Wildlife Services has used

CEs three years in a row is strong evidence that the agency will repeat this unlawful use of CEs

in the future.  *Alaska Center for Environment,* 189 F.3d at 856 (fact that Forest Service had

issued identical permit again was evidence that conduct would be repeated in the future).

Because Plaintiffs have established standing, and the other jurisdictional arguments are

irrelevant to Plaintiffs' claims, this Court can proceed to rule on the merits of Plaintiffs' claims.

## II.    WILDLIFE SERVICES HAS NOT COMPLIED WITH NEPA FOR ITS WOLF CONTROL ACTIVITIES.

Wildlife Services relies on its five-year monitoring reviews and its use of CEs to satisfy

its NEPA requirements for all its wolf control activities in Idaho, but neither of these paths are

sufficient to satisfy NEPA here.

### A.    The Five-Year Reviews Do Not Satisfy NEPA For Wolf Control Actions.

Wildlife Services previously prepared Environmental Assessments (EAs) for its predator

damage management program in Idaho, issuing an assessment for northern and central Idaho in

1996 and assessments for southern Idaho in 1996 and 2002.  *AR APHIS 000415-607, 618-709.*

The agency states that the five-year reviews were prepared for the purpose of reviewing the

results of predator damage activities after issuance of the 1996 and 2002 EAs and to evaluate the

accuracy of the prior analysis in the EAs.  *Def. Br. at 18.*  It compares the reviews to

supplemental information reports that are prepared "to determine whether there is a need to

conduct supplemental NEPA analysis."  *Id.*  The flaw with this argument is that the need for

supplemental analysis only arises when there is an original analysis present, but there was never

any original analysis considering alternatives to, or the effects of, wolf control activities in the

1996 or 2002 EAs.  *See AR APHIS 00415-607, 00618-709.*

For instance, Wildlife Services determined that the information presented in the five-year

reviews did not warrant a *further* look at alternatives, but with regard to wolf control actions, there was never any initial look.  *Def. Br. at 18.*  In the 1996 and 2002 EAs, the discussion of alternatives and their effects included little to no information about wolves and wolf control actions, and thus there was no initial look at alternative wolf control measures or their effects. *AR APHIS 00415-478, 540-575, 652-690.*   Even Wildlife Services admits that the reviews simply discussed the alternatives that were considered in the prior EAs, and were not prepared to evaluate additional alternatives but only to determine whether to revisit the existing EAs.  *Id. at 18-19.*  Thus, Wildlife Services has never analyzed a range of alternatives to its existing wolf control activities and their effects, in violation of NEPA.  Again, Plaintiffs are not challenging the old EAs, they are challenging Wildlife Service's current control activities that have never been properly reviewed under NEPA.

Similarly, the prior EAs did not contain a cumulative effects analysis for wolf control actions and the five-year reviews did not satisfy that requirement either.  The EAs only considered cumulative effects of predator damage management to populations of the primary target species, which did not include wolves.  *See AR APHIS 463, 563, 666.*  The five-year reviews considered how many total wolves were removed from the statewide wolf population from wolf control actions, but that was the extent of any effects analysis.  *AR APHIS 713, 735.* They did not fully analyze the direct, indirect, or cumulative effects of wolf control actions to satisfy a "hard look" under NEPA.

For instance, the reviews did not discuss the locations of the control actions and therefore did not acknowledge that the majority occurred in western and central Idaho, repeatedly removing wolves from the same packs and same areas due to conflicts with livestock in those areas, or analyze the effects of these repeated removals on the wolf population and its

PLAINTIFFS' RESPONSE/REPLY BRIEF ON SECOND CLAIM FOR RELIEF - 11

distribution.  *See Second Cole Decl. ¶¶ 20-28 & Ex. D.*  Repeatedly removing wolves from the same packs certainly influences the dynamics and size of those packs.  Consistently removing wolves from the same geographic areas influences the distribution of wolves as well as their movements and migrations.  None of these effects to the wolves themselves were analyzed in the five-year reviews.

Nor did the reviews consider impacts to other resources in these areas from repeatedly removing a top predator from the ecosystem, such as impacts to elk distribution and riparian vegetation or to small mammal populations, as described in the Second Declaration of Kenneth Cole and the references cited therein.  *Second Cole Decl. ¶¶ 16-19 and Exs. A-C.*  And consistently removing wolves from the eastern and central portions of the SNRA (primarily the Sawtooth Valley and White Cloud Mountains) impacts the public's use and enjoyment of this National Recreation Area.  *Second Cole Decl. ¶¶ 29-32; AR APHIS 002285-86, 002364, 2375-76* (SNRA control actions).  This information is not simply bureaucratic makework or needless paperwork, as Defendants contend, but important information for assessing the full impacts of Wildlife Service's control actions. *See Def. Br. at 20 n.13.*  The cursory analysis in the five-year reviews do not satisfy NEPA's requirement for a hard look at all direct, indirect, and cumulative effects of these activities.

Because the five-year reviews are not adequate as stand alone NEPA analyses for wolf control activities, and the prior EAs did not assess those activities either, none of the prior NEPA documents issued by Wildlife Services satisfies its NEPA duty for wolf control actions.

## B.    Wildlife Services Unlawfully Relied on CEs for its Wolf Control Actions.

Wildlife Services is continuing the pattern that the federal government has tried in many contexts of attempting to avoid conducting a thorough review of its actions by using a

PLAINTIFFS' RESPONSE/REPLY BRIEF ON SECOND CLAIM FOR RELIEF - 12

categorical exclusion.  Here, Wildlife Services tries to fit its actions of killing wolves across the state into a CE by looking separately at each wolf management zone and using a categorical exclusion intended for much smaller individual projects rather than a widespread activity that occurs year after year.  Because Wildlife Service's interpretation of the CE here is inconsistent with the terms and examples used in the regulation, the Court should not give that interpretation any weight.  *West v. Secretary of Dep't of Transportation,* 206 F.3d 920, 928-29 (9th Cir. 2000) (citing *Alaska Center for the Env't v. U.S. Forest Service,* 189 F.3d 851, 857 (9th Cir. 1999)). The decision that its wolf control activities were not subject to NEPA review was unreasonable, and thus Wildlife Services must prepare an EA or EIS.  *California ex rel. Lockyer v. U.S. Dept. of Agric.*, 575 F.3d 999, 1011 (9th Cir. 2009).

Wildlife Services invoked a CE that applies to "routine measures" for its statewide ongoing wolf control activities and justified that decision by stating that the control actions technically meet the four criteria for use of this CE. *Def. Br. at 21-22.*  Although this Court previously noted that this CE category *may* pertain to killings, presumably of predators, it never considered whether a widespread continuous control program reasonably fits within this CE. *Committee for Idaho's High Desert v. Collinge*, 148 F. Supp.2d 1097, 1102 (D. Idaho 2001). And in fact, Wildlife Service's control actions do not reasonably fit within this category.

The CE for routine measures states that the use of target-specific devices or remedies must be localized or contained in areas where humans are not likely to be exposed, and limited in terms of quantity, i.e. individualized remedies.  7 C.F.R. § 372.5(c)(1)(i)(A).  The examples of routine measures provided in the regulations are:

> (A) Inoculation or treatment of discrete herds of livestock or wildlife undertaken in contained areas (such as a barn or corral, a zoo, an exhibition, or an aviary); (B) Pesticide treatments applied to infested plants at a nursery; and (C) Isolated (for example, along a highway) weed control efforts.

PLAINTIFFS' RESPONSE/REPLY BRIEF ON SECOND CLAIM FOR RELIEF - 13

7 C.F.R. § 372.5(c)(1)(ii).

The widespread killing of wolves across the state or even across an entire wolf management zone is certainly not a localized or contained activity that is limited to an individualized remedy.  The trapping, snaring, and aerial shooting of wolves occurs across thousands of acres of both public and private land and occurs on a continuous, ongoing basis. For instance, Wildlife Services killed 82 wolves and trapped and released 10 wolves from at least 14 different packs in FY 2008, and killed 107 wolves and trapped and released 12 wolves from at least 18 different wolf packs across the state in FY 2009.  *AR APHIS 001480-83, 001495-98; Cole Decl. Ex. D* (2008 & 2009 maps highlighting packs subject to killings).

These actions are not at all similar to the examples of limited, contained, individualized "routine measures" provided in the regulations, strongly indicating that the use of this CE here was unreasonable.  *See California ex rel. Lockyer,* 575 F.3d at 1017 (looking at examples of activities listed in handbook to determine that challenged activity did not fall within CE category); *West,* 206 F.3d at 928 (finding that magnitude of project was much larger than the examples of activities provided in CE regulation, strongly indicating the use of CE was inappropriate); *Citizens for Better Forestry v. U.S. Dept. of Agric.,* 481 F. Supp.2d 1059, 1087 (N.D. Cal. 2007) (holding that scope of project was much larger than that contemplated by CE and thus CE was inapplicable); *Committee for Idaho's High Desert,* 148 F. Supp.2d at 1102 (considering examples of "research activity" in APHIS regulations to determine if challenged activity fell within CE category).

Furthermore, the regulations specifically do not allow the use of this CE "when any routine measure, the incremental impact of which, when added to other past, present, and reasonably foreseeable future actions (regardless of what agency or person undertakes such

action), has the potential for significant environmental impact."  7 C.F.R. § 372.5(d)(1).  The

wolf control activities within each wolf management zone that occur year after year, when added

to control activities in the other management zones as well as other wolf killings and mortalities,

have the potential for significant environmental impacts not only to the wolves themselves but to

other resources as well, as noted above.  *See supra pp. 11-12*.  The CEs failed to consider any

cumulative effects other than total mortality within the overall statewide wolf population.  *See*

*e.g. AR APHIS 001259* (Sawtooth Wolf Management Zone CE).

   This limited view of cumulative effects was not sufficient to show that there was no

potential for significant effects, as required for use of the CE.  *Center for Food Safety v. Vilsak,*

2010 WL 3835699 at *7 (N.D. Cal. Sept. 28, 2010) (CE unlawful where APHIS failed to explain

why effects of activity, when added to other cumulative effects, would not have any potential

significant environmental impact).  "Application of a CE is inappropriate if there is the

possibility that an action *may have* a significant environmental effect."  *Citizens for Better*

*Forestry,* 481 F. Supp.2d at 1087 (noting that plaintiffs had referred to a number of potential

significant effects that *may* result from the proposed activity) (emphasis in original).

   By creating a separate CE decision for each wolf management zone, Wildlife Services

also unlawfully segmented and isolated its decisions to avoid proper NEPA review of the

cumulative impacts of all its control activities.  *See Center for Food Safety*, 2010 WL 3835699 at

*7 (holding CE unlawful where APHIS segmented and isolated permits to avoid looking at

cumulative impacts).  "Significance cannot be avoided . . . by breaking [an action] down into

small component parts."  *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208,

1215 (9th Cir. 1998) (holding that Forest Service had to analyze five timber sales within the same

watershed in a singe EIS to adequately consider cumulative impacts) (quoting 40 C.F.R. §

PLAINTIFFS' RESPONSE/REPLY BRIEF ON SECOND CLAIM FOR RELIEF - 15

1508.27(b)(7)).  "NEPA requires that the 'analysis be done in a single document when the record raises 'substantial questions' about whether there will be 'significant environmental impacts' from the collection of anticipated projects.'" *Western Watersheds Project v. Bennett,* 392 F. Supp.2d 1217, 1224-25 (D. Idaho 2005) (citing *Klamath Siskiyou Wildlands Center v. BLM,* 387 F.3d 989, 999 (9ᵗʰ Cir. 2004) & 40 C.F.R. § 1508.25(a)(3)) (holding that BLM had to analyze grazing on 28 allotments within single NEPA document rather than 4 EAs to adequately consider cumulative effects).  The wolf control activities across the state are identical actions that must be analyzed in a single, comprehensive document to adequately address their cumulative impacts to the wolves and to other resources.[3]

Wildlife Services has initiated the EA process for its statewide wolf damage management and issued a draft EA.  *See Draft EA for Gray Wolf Damage Management in Idaho, found at http://www.aphis.usda.gov/regulations/pdfs/nepa/idaho_wolf_ea.pdf.*  But there is no guarantee if or when it will complete this process and issue a final decision.  Because the agency is still conducting wolf control activities without proper NEPA analysis, it is violating NEPA.  And until it completes such an analysis, it cannot take any action that will cause any irreversible or irretrievable commitment of resources.  *See Plaintiffs' Opening Br. at 20-22.*

### III.   WILDLIFE SERVICES HAS NOT COMPLIED WITH THE SNRA ACT.

Wildlife Services argues that it does not have to abide by the SNRA Act requirement to avoid substantial impairment of SNRA values, and furthermore that it can rely on the Forest Service's substantial impairment analysis to analyze wolf control actions.  Both of these arguments are incorrect, however, because Wildlife Services has it own duty to insure that its

---

[3]  Wildlife Services also argues that dividing the action by wolf management zone was reasonable because IDFG was directing Wildlife Service's control activities. *Def. Br. at 24.* However, as noted above in section I.A.2., IDFG is no longer managing wolves in Idaho.

PLAINTIFFS' RESPONSE/REPLY BRIEF ON SECOND CLAIM FOR RELIEF - 16

wolf control activities that occur in and around the SNRA, on both public and private land, are not substantially impairing SNRA values.

The SNRA Act states that the *Secretary of Agriculture* shall administer the recreation area in such manner as will best provide the management, utilization, and disposal of natural resources on federally owned lands such as timber, grazing, and mineral resources insofar as their utilization will not substantially impair the purposes for which the recreation area is established.  16 U.S.C. § 460aa-1(a); Pub. L. No. 92-400, Sec. 2(a).  Wildlife Services is a division of the Animal and Plant Health Inspection Service within the Department of Agriculture.  Because the SNRA Act gives direction to the Secretary of Agriculture, that direction applies to Wildlife Services just as it does to the Forest Service because both agencies are within the Department of Agriculture.

The fact that Wildlife Services acts pursuant to the Animal Damage Control Act, 7 U.S.C. § 426 *et seq., does not mean it can ignore direction under the SNRA Act.  *See Def. Br. at 26.*  Because both the Animal Damage Control Act and the SNRA Act apply to Wildlife Services, as an agency under the Secretary of Agriculture, Wildlife Services must comply with both Acts.  Agencies must harmonize statutes and give effect to both if possible. *Morton v. Mancari,* 417 U.S. 535, 551 (1974); *California ex rel. Sacramento Metropolitan Air Quality District v. United States,* 215 F.3d 1005, 1012-13 (9th Cir. 2000).  If statutes are in conflict, the more specific statute controls over a more general statute.  *S.V. v. Sherwood School District,* 254 F.3d 877, 881 (9th Cir. 2001); *Santiago Salgado v. Garcia,* 384 F.3d 769, 773-74 (9th Cir. 2004) ("a specific statute will not be controlled or nullified by a general one"); *California ex rel. Metropolitan Air Quality District,* 215 F.3d at 1013 (same).  Thus, Wildlife Services must carry out its duties under the more general Animal Damage Control Act in a way that complies with

the requirements of the SNRA Act, and to the extent that there is a conflict, the SNRA Act must

control as that is the more specific statute that applies to that particular area of land.

Moreover, Wildlife Services recognized that land designations such as Wilderness or

National Recreation Area affect its implementation of control actions.  In its 2002 EA for

predator damage management in southern Idaho, Wildlife Services stated that:

> A number of different types of areas exist on Federal lands within the analysis
> area which currently have a special designation and/or require special
> management consideration.  These include Wilderness Areas (WAs) or Primitive
> Areas (PAs), Wilderness Study Areas (WSAs), Research Natural Areas (RNAs),
> Areas of Critical Environmental Concern (ACECs), a National Recreation Area
> (NRA), a National Conservation Area, and a National monument.  The special
> management required for these different areas varies considerably by designation
> and land administrator, and is governed by different legal mandates.
> . . .
>
> WS wildlife damage management is conducted (and is proposed to continue in the
> future) in WAs only in limited instances, when and where a specific need is
> identified, *only when allowed under the provisions of the specific WA designation*,
> and only after consultation with the responsible land management agency. WS
> activities in special management areas have historically been, and are expected to
> continue to be a minor part of the overall WS program.  Standard operating
> procedures for conducting predator damage management in WAs and WSAs are
> listed at the end of Chapter 3.

*AR APHIS 000640-41* (emphasis added); *see also 000432-33, 530-31* (1996 EAs).

Chapter 3 of the EA contained mitigation measures for Wilderness and Special

Management Areas, including that no aerial hunting and no toxicants would be used in any

wilderness area.  *AR APHIS 000663, see also 000452, 553.*  The 2002 EA noted that Craters of

the Moon National Monument and Snake River Birds of Prey National Conservation Area are

also found in the analysis area and that Wildlife Services would follow guidelines applicable to

those areas when carrying out any control actions.  *AR APHIS 000641-42.*  The 1996 northern

and central Idaho EA also mentioned the Hells Canyon National Recreation Area, but none of

the EAs mentioned the SNRA.  *AR APHIS 000531, 641-42, 433.*

PLAINTIFFS' RESPONSE/REPLY BRIEF ON SECOND CLAIM FOR RELIEF - 18

Although the 1996 and 2002 EAs did not mention the SNRA by name, they clearly recognized that Wildlife Services must carry out its duties consistent with the Acts that designate special management areas like wilderness, national monuments, and national recreation areas. Thus, Wildlife Services has an obligation to follow the SNRA Act as well.

In fulfilling this obligation, Wildlife Services cannot simply rely on the Forest Service's substantial impairment analysis.  That analysis considered whether livestock grazing on Forest Service lands was substantially impairing wildlife and recreation values of the SNRA.  *See AR APHIS 002362-2365.*  Although this analysis discussed wolf control actions taken in response to conflicts with livestock grazing Forest Service allotments in or around the SNRA, the parameters of the analysis were whether the Forest Service's *grazing authorizations* were causing substantial impairment. *Id.*  Thus, the analysis did not consider whether control actions taken on private land or state land, combined with control actions on public land, were causing substantial impairment.

In fact, control actions on private and State land were noted as one of the reasons that the Forest Services' grazing authorizations alone did not cause substantial impairment.  *AR APHIS 002363-64.*  The Forest Service stated that depredation of cattle by wolves occurs most often on private lands, and that "as long as calving and livestock grazing continues on State and private lands in or near the Sawtooth NRA, the risk of mortality to wolves from predator control will exist whether or not livestock grazing continues on National Forest System lands within the Sawtooth NRA." *Id.*  The analysis noted that almost as many depredations occurred on private land within or near the SNRA as on Forest Service land.  *AR APHIS 002375.*  Thus, because the Forest Service's analysis only considered impacts of control actions taken in response to grazing on Forest Service land, Wildlife Services must conduct it own analysis to consider whether control actions taken on all land within or near the SNRA is causing substantial impairment.

PLAINTIFFS' RESPONSE/REPLY BRIEF ON SECOND CLAIM FOR RELIEF - 19

A second reason the Forest Service gave for concluding that its grazing authorizations are not causing substantial impairment was that the Forest Service has imposed modifications to grazing practices to reduce livestock-wolf conflicts on its lands. *AR APHIS 002364.* The analysis described the mitigation measures the Forest Service has used to reduce conflicts, such as adjusting trailing routes, adjusting turn-out dates, or grazing alternate areas to avoid wolf denning sites and known locations of wolves, or protecting livestock from wolves by using fladry and keeping watch over the sheep at night. *AR APHIS 002385-2389.* While mitigation to reduce livestock-wolf conflicts has occurred on Forest Service land, the Forest Service cannot require similar mitigation on State or private land.

The Forest Service considered only whether its grazing authorizations were substantially impairing SNRA values in its analysis. Because the Forest Service's grazing authorizations are tied to only about half of the wolf control actions in or near the SNRA, and its grazing mitigation to reduce livestock-wolf conflicts occurs only on Forest Service land, Wildlife Services cannot exclusively rely on this analysis to demonstrate that all of its control actions in or near the SNRA are not causing substantial impairment of SNRA values. [4]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment on their second claim for relief.

Dated: October 28, 2010            Respectfully submitted,

                                    /s/ Lauren M. Rule
                                    Lauren M. Rule
                                    Attorney for Plaintiffs

---

[4]  Plaintiffs are not responding to the remedy arguments of Wildlife Services or the State. Plaintiffs did not brief remedy in their opening brief and have not yet sought any injunctive relief nor supplied any materials in support of any request for injunctive relief. If Plaintiffs should win on the merits, the parties will address remedy at that time.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of October 2010, I caused Plaintiffs' Response/Reply in Opposition to Defendants' Cross Motion and in Support of Plaintiffs' Motion for Summary Judgment and the Third Declaration of Lauren M. Rule and attached exhibits to be electronically filed with the Clerk of the Court using the CM/ECF system, which sent an electronic notice of filing to the following counsel of record:

Deborah Ferguson
Assistant U.S. Attorney, District of Idaho
Deborah.Ferguson@usdoj.gov

Kathryn M. Liberatore
U.S. Department of Justice
Kathryn.Liberatore@usdoj.gov

Beverly Li
U.S. Department of Justice
Beverly.Li@usdoj.gov

Kathleen Trever
Deputy Attorney General
Idaho Dept. of Fish and Game
kathleen.trever@idfg.idaho.gov

/s/Lauren M. Rule_____
Lauren M. Rule